## McPerkin v. Commonwealth.

(Decided December 5, 1930.)

(As Modified on Denial of Rehearing January 16, 1930.)

MARTIN BROWN for appellant.

J. W. CAMMACK, Attorney General, and ULIE J. HOWARD for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Affirming.

Anderson McPerkin appeals from a judgment entered upon a conviction of rape, by which the sheriff of Kenton county is directed to hang him by the neck until he is dead.

This crime is alleged to have been committed in Crescent Springs, a village on the Southern Railway in Kenton county, Ky., and the time of its commission is fixed at approximately 3:30 p. m. Thursday, March 6, 1930. The severity of the defendant's sentence is our excuse for reviewing the evidence with some meticulosity. We shall endeavor to avoid mentioning names of the female witnesses as far as possible. We shall begin our statement of the evidence with the testimony of the neighbors.

The first neighbor who testified was a lady who had been to the grocery, and about 3:00 or 3:30 p. m., as she returned, she noticed the defendant walking on the railroad track ahead of her. He stopped and lay down on

the side of the railroad property, she had to pass him, she watched him, and, when she got home and had put down her purchases, she looked out and saw him approaching the home of the woman whom he made his victim. She identified the defendant as the man she had seen approaching this home. She kept watching, and he did not come out. Soon the victim's daughter, who had also gone to a grocery, returned, and this neighbor saw her enter the house and soon run out again screaming. This neighbor ran over there and stayed until after the defendant had been arrested and brought back, and she then identified him as the man she had seen.

Another neighbor lady testified she saw the first one as she walked along the railway behind the defendant. She saw the defendant lie down, and, after the first neighbor had passed him, this second neighbor lady saw the defendant start toward the home of his victim, but her view was soon cut off by a building. She watched to see if he would come back, he did not, and soon the victim's daughter ran screaming from the house, and this neighbor went over there; soon the defendant was arrested and brought back there. The witness testified the man brought back was the man she had seen enter the house and is the defendant.

The next witness was John Beil, Sr., who was on Walnut street, delivering papers, and saw a man come running from the direction of the home of the victim of this crime. When that man saw Beil, he stopped running, and continued walking fast toward the railroad bridge. He said this man was the defendant, and he pointed out the way he had gone to Andy Mallapelli and Kinney Niemeyer, the men who made the arrest.

The next witness was a lady who was visiting her mother on Walnut street on this afternoon, and she saw a colored man running past there toward the railroad bridge. She said he would run a little way, then look back, then run again, and look back.

The fourth neighbor woman who testified identified the defendant as a man she saw coming rapidly from the direction of the home of the victim of this crime on the day of its commission. The fifth neighbor lady merely testified that about the time of this crime she saw a colored man running from the direction of where it was committed toward the bridge. The next witness was Walter Hageman, and he testified he saw the defendant

running along the railroad track, saw Niemeyer and Mallapelli after him, and at their request he helped them stop and arrest him. He testified it was about a twelve-minute walk from where this crime occurred to where the defendant was arrested.

The next witness was T. P. Cappell, a railroad section foreman, who was walking the railroad track and saw the defendant running from the home of his victim across the adjoining lot in the direction of the bridge where later he was arrested. He identified the defendant as the man he saw.

The next witness was Andy Mallapelli, a man employed by Charles Niemeyer, an ice dealer. He saw the daughter of the victim run out of the house screaming for help. He saw the defendant running, and he, Niemeyer, and Hageman commandeered an automobile, pursued him, overtook him, arrested him, and brought him back. The evidence of Niemeyer is practically the same. The pursuit and arrest of the defendant were probably completed within 10 minutes after the crime was committed, but the witnesses give various estimates of the time.

We will not go into the sordid details of the crime itself. The victim, a woman 36 years of age, was lying on the bed with her face to the wall. Something caused her to look around and she saw the defendant, who, telling her not to holler or he would kill her, proceeded to accomplish his purpose, and had done so when the victim's daughter returned from the grocery and came upon the defendant flagrante delicto. We shall simply mention the marks and bruises on the victim, which were described by women who soon gathered in. Both the victim and her daughter positively identified the defendant that day when he was arrested, and also at the time of the trial. So did other witnesses. The defendant admits he was at the house, but says he only asked for something to eat; the door was slammed in his face, and he went quietly away. He said the next place he stopped was a section house, and he called as a witness a Miss Cappell, the 12 year old daughter of the section man, who said some colored man did ask her for food that day, but, unfortunately for the defendant, she fixes the time at 1 o'clock, whereas he fixes it as late in the evening.

We shall now consider the matters upon which he relies for reversal of the judgment.

## The Motion to Quash.

A large part of this record is made up of evidence heard concerning the personnel of the grand and petit juries, upon a motion to quash the indictment. The answer to all that is to be found in this section of the Criminal Code of Practice:

Section 281: "The decisions of the court upon challenges to the panel, and for cause, or upon motions to set aside an indictment, shall not be subject to exception."

The right of appeal is a matter of grace which the state can extend or withhold as it may deem fit, and by this section of the Code it has closed the door so far as the matters set out in this section of the Code are concerned. During the first 61 years of the history of this commonwealth, there was no right of appeal in criminal cases.

In the case of Lake v. Com., 209 Ky. 832 273 S. W. 511, 512, one of the grounds relied on for reversal was, "Erroneous rulings of the court in the selection of the jury."

The appellant there, like the appellant here, was contending he had been deprived of some right that was his under either the state or Federal Constitution. We considered the question then, worked it out with meticulous care, and settled it adversely to the appellant's contention.

We shall not quote from that opinion, because we do not want to take any of the language, there used, out of its setting and we refer to the opinion as a whole. This is of the gravest importance to the appellant, but what we said in that opinion is fully supported by the authorities there cited as well as those cited in the notes under section 983, page 1209, of 12 C. J.

## The Motion to Remand.

After the court had overruled his motion to quash defendant made a motion to remand, which the court overruled, and defendant excepted. This the defendant says was error. Just what he means by all this is not clear to us, and he has made no effort to elucidate the matter; hence it is waived.

### WAIVER OF TRIAL BY JURY.

When the case was called for trial, the defendant moved that a jury be waived and that he be tried by the court, and, his motion being overruled, he excepted, and this he says was a prejudicial error. We cannot agree with him. Trial by jury in felony cases, is a constitutional right that cannot be waived. Jackson v. Com., 221 Ky. 823, 299 S. W. 983; Branham v. Com., 209 Ky. 734, 273 S. W. 489.

### DEMURRER TO THE INDICTMENT.

The defendant's demurrer to the indictment was, so he says, erroneously overruled, but we have examined it, and we approve the action of the trial court. He did not think enough of this alleged error to discuss it.

### THE EVIDENCE OF HIS VICTIM.

The defendant contends the evidence of his victim should be disregarded because she is, so he says, a victim of hallucination. This is based on the answers made by her upon cross-examination, to the effect that God whispered in her ear during the progress of the crime; that she received a communication from God, when she first asked Him to help her; that she had in some ways, been getting warnings or whisperings since she was a child; and that she did not know who whispered these things to her unless it were the angels. No further attempt was made to develop the exact nature of these whisperings, so whether such development would have shown these to be merely the promptings of conscience that come to all of us, or that the victim actually believed she heard supernatural voices, we know not, but, giving the defendant the benefit of the doubt, and conceding that the evidence shows his victim believes she hears or has heard supernatural voices, she is not the first one to claim to have heard such voices; there are others, for example: Moses, Socrates, Saul of Tarsus, Mohammet, Emanuel Swedenborg, the second Earl Grey of England, Joan of Arc, Bernadette Soubirous, etc. We are neither prepared nor disposed to go into an extended discussion of this, but the citation of these names of persons who, by what they have said and done, have affected the lives of vast numbers of mankind, is enough to show that such a claim does not render one incredible. All of this was

for the jury to consider in determining whether or not to believe her testimony.

## The Instructions.

The court instructed on rape and on detaining a woman against her will, with instructions to find him not guilty if the jury entertained a reasonable doubt of his having been proven guilty or to find him guilty of detaining a woman if they believed him guilty but entertained a doubt as to the offense of which he is guilty.

The defendant complains of the instruction under which he was convicted, but it follows so exactly the instructions we approved in Lowry v. Com., 65 S. W. 434, 23 Ky. Law Rep. 1553, Lake v. Com., 104 S. W. 1003, 31 Ky. Law Rep. 1232, and Bowman v. Com., 146 Ky. 486, 143 S. W. 47, that we are quite sure it was written by the judge with those books open before him. He contends the jury may have reached the conclusion the defendant did not succeed in accomplishing his purpose, but if that had been true, then the jury would have found him guilty of detaining a woman, etc., a question submitted to the jury under a proper instruction and of which he does not complain.

We find no error in the instructions given or that any instructions were omitted that should have been given, and this applies to the peremptory instruction to acquit him, for which he made proper and timely motion but which the court correctly overruled.

## The Husband as a Witness.

The husband of the defendant's victim was introduced, and testified, over defendant's objection, to the scratches, bruises, and blood upon his wife's legs, etc. This, the defendant alleges, was learned by him from an exposure of them to his view, by his wife, that such exposure to him would not have been made by her had he not been her husband, hence, so he says, this was something he had learned by reason of the married relation existing between him and his wife, and was inadmissible. Whether or not there was a time in the history of jurisprudence that his contention would have been sound we need not inquire, for, by section 605 of the Civil Code of Practice, all disqualifications have been swept away, except those retained by the exceptions contained in sec-

tion 606, and, unfortunately for him, those exceptions do not embrace such evidence as this of which he is complaining.

The judgment is affirmed.

Whole court sitting..